## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CASE NO. 22-CR-189-RMR

**UNITED STATES OF AMERICA,**

> Plaintiff,

v.

**ROBERTO KANO-CASTILLO,**

> Defendant.

---

## ROBERTO KANO-CASTILLO'S SENTENCING STATEMENT AND MOTION FOR DOWNWARD VARIANCE

---

Roberto Kano-Castillo, through counsel, respectfully request that this Court impose a variant sentence of 12 months imprisonment followed by the 3-year period of supervised release recommended in the presentence investigation report (PSIR). No greater sentence is necessary to effectuate the goals of 18 U.S.C. § 3553(a).

### I. Mr. Kano-Castillo returned to the United States to attend a funeral.

After Mr. Kano-Castillo was last removed from the United States in 2017, he resolved to remain in Mexico and build a life for himself there. He lived in his family home in Durango, Mexico and earned a living by driving a taxi and repairing windshields. However, in July of last year, his sixteen-year old niece, who had been

1

living in Colorado, was killed in a car accident. Mr. Kano-Castillo returned to the United States to attend her funeral and grieve with his family. Mr. Kano-Castillo's brother was devastated by the loss of his daughter, and he died a few months later. Had this tragedy not occurred, he would have remained in his home country.

## II. Mr. Kano-Castillo remained in the United States for better economic opportunities and because he met his fiancé.

Mr. Kano-Castillo began working the day after he arrived in the United States. As the PSIR explains, he has worked for his survival since he was a child. Although the death in the family had prompted his return to this country, he could not afford to stop working. He worked as a day laborer until he found more stable employment through CNS Drywall, and later with the contractor Juan Tapia.

Mr. Kano-Castillo earned approximately $150 per week working two jobs in Mexico. But in the United States, he was able to earn around $800 per week – more than 5 times what he earned in Mexico. Because his quality of life was so much better here than in Mexico, he was in no hurry to return.

He also met his fiancé, Jessica Snow, approximately one month after he arrived in Colorado. As Ms. Snow explains in her letter, *see* Attachment A- Letter from Jessica Snow, she lives with multiple sclerosis and her illness limits her ability to work and perform basic house chores. He provides a great deal of emotional, physical, and

financial support to her. Their relationship and her reliance on him gave him an additional reason to stay.

Even though his life in Colorado was much better than his quality of life in Mexico, Mr. Kano-Castillo has no intention of attempting to return to the United States. Mr. Kano-Castillo cannot afford to be unemployed for long periods of time, and incarceration forces him into a state of unemployment. The benefits of living and working here do not outweigh the cost.

## III. The racist origins of 8 U.S.C. § 1326 are relevant to 18 U.S.C. § 3553(a).

In addition to the facts and circumstances personal to Mr. Kano-Castillo, the nature and history of the law that he has been convicted of violating merits consideration in weighing the seriousness of the offense. The origins of 8 U.S.C. § 1326 are grounded in anti-Latinx racism and the early 20th Century fad of eugenics. Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of 1929" was conceived, drafted, and enacted by white supremacists out of a belief that the "Mexican race" would destroy the racial purity of the United States. Legislators referred to Mexicans as "mongrels" and "peons" and claimed Mexicans were "poisoning the American citizen."[1] They solicited reports and testimony from a

---

[1] *United States v. Machic-Xiap*, No. 3:19-CR-407-SI, 2021 WL 3362738, at *6 (D. Or. Aug. 3, 2021) (outlining legislative history of 8 U.S.C. 1326).

3

eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[2]

This shameful and uncomfortable history is directly relevant to the Court's consideration of the nature and circumstances of the offense, the seriousness of the offense, and the need to promote respect for a law that seeks to criminalize individuals based largely on their "undesirable" race. The Court should also consider the disparate criminalization of almost exclusively Latinx individuals under § 1326, while unauthorized immigrants from Canada and Europe who have overstayed their visas face no criminal penalties at all. The Court is required to consider each of these factors under § 3553(a) and has discretion to consider policy arguments as necessary to impose a sentence "sufficient, but not greater than necessary." *See Kimbrough v. United States,* 552 U.S. 85, 89 (2007); *Spears v. United States,* 555 U.S. 261, 264 (2009).

## A. 8 U.S.C. § 1326 is grounded in white supremacy.

The idea of criminalizing "border-crossers" took hold less than 100 years ago, after World War I.[3] After the war, in the mid-1920s, anti-immigrant sentiment rose to

---

[2] *Id.*

[3] *See* Ian McDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy,* PROPUBLICA, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy (last accessed Oct. 20, 2022); Kelly Lytle Hernandez, *How Crossing the US-Mexico Border Became a Crime, THE CONVERSATION,* April 30, 2017, https://theconversation.com/how-crossing-the-us-mexico-border-became-a-crime-74604 (last accessed Oct. 20, 2022); Libby Watson, *How Crossing the Border Became a Crime, SPLINTER NEWS,* June 29, 2018, https://splinternews.com/how-crossing-the-border-became-a-crime-1827160001

a fever pitch. In 1924, Congress passed the National Origins Act, which established quotas, effectively choking out any immigration from Asia or any other country other than those in Northern and Western Europe.[4] However, the agricultural industry resisted capping the numbers of immigrants – and in particular, migrants – from Mexico. *Id.* This was not because they wanted immigrants from Mexico to come, assimilate and succeed in America – most of these same men who used Mexican labor to harvest their crops believed that these men and women were unfit to be United States citizens. *Id.*

In 1927, the Secretary of Labor, James Davis, and South Carolina Senator Coleman Livingston Blease teamed up to engineer a new way to criminalize non-white immigrants who entered the United States without advance permission. *Id.* Since its inception, the law governing illegal reentry has been weaponized against a larger population of "undesirable" Latinx communities, including Central American immigrants, *id.*, but never once has it been meaningfully revisited with an eye toward the troubling historical context of its enactment.

Both of the men who drove the statute's enactment were firmly opposed to non-white people immigrating to the United States. James Davis was a devout eugenicist who believed that those with "tainted blood, weak mentality or physical

---

(last accessed Oct. 20, 2022).
[4] Hernández, *supra* n. 3.

fault, threaten the whole physical, mental, and moral level of the American people."[5]
To sow fear, Davis used the metaphor of illegal immigrants as home invaders –
forcefully and dangerously breaking into the United States.[6] In July of 1923, as
Secretary of Labor, he wrote that "historians and scientists [told him] that all the great
civilizations of the past have fallen, not through hostile invasion, but through the
peaceful penetration of *alien peoples,* usually entering their gates *as workers* or *slaves.*"[7]
Davis specifically advocated race-based immigration control "so that America may
not be a conglomeration of racial groups […] but a homogenous race striving for the
fulfillment of the ideals upon which this Government was founded."[8] He envisioned a
mechanism by which criminal laws would be enacted to deter non-white races from
immigrating to the United States.

Senator Blease, his co-author, was a man who was a "proud and
unreconstructed white supremacist."[9] He was also a talented politician. In 1929, he
presented legislation that satisfied both the desire to make America a white nation and
the Southwestern farmers' concerns with their continued access to exploiting cheap

[5] Watson, *supra* n. 3 (linking to *America and Her Immigrants,* The Congressional Digest, Vol. II, Nos. 10-11 (July-August 1923)).
[6] McDougall, *supra* n. 3
[7] Watson, *supra* n.3 (emphasis added).
[8] Watson, *supra* n. 3 (linking to James J. Davis, *One Hundred Years of Immigration,* N.Y. Times, Feb. 17, 1924) (emphasis added).
[9] McDougall, *supra* n. 3.

labor from non-white workers—they simply would not enforce the criminal penalties until the agricultural season was over.[10]  Nor would they prosecute migrants who registered at a Port of Entry, which exculpated those with the resources to do so.[11] The very same workers who harvested America's crops would be criminalized for doing so, once their employers no longer had use for them.

Thus, in 1929, crossing the border to enter the United States without prior permission became a crime. The law was immediately weaponized against non-white immigrants. The United States government immediately prosecuted hundreds of individuals in 1929.[12] The vigor to prosecute ramped up the following year, with approximately 7,000 people facing charges in 1930. Mexican nationals comprised at least 85% or more of those prosecuted every year.[13] The statistical demographic patterns of prosecution have remained constant since that time; and, over the past decade, the numbers of illegal reentry prosecutions have exploded. An increase in number of cases has not led to increased diversity in those prosecuted, however—nearly 100% of the defendants are classified as "Hispanic" and hailing from Mexico and Central America.[14]

---

[10] *Id.*; *see also* Doug Keller, *Re-thinking Illegal Entry and Re-entry,* 44 Loy. U. Chi. L.J. 65, 72-73 (Fall 2012).

[11] Watson, *supra* n. 3.

[12] Keller, *supra* n. 10 at 76

[13] Hernandez, *supra* n. 3.

[14] *See* Keller at 121-137 (describing the increase in illegal reentry prosecutions in the decade leading up to 2012 and the policy this increase); American Immigration Council, "Prosecuting People for

Enforcing a law with roots like this, without acknowledging and accounting for those roots, does nothing to promote respect for the law or assure the public that a person prosecuted for unlawfully entering this country has been punished justly.

## B. There is statistical evidence of racist enforcement of 8 U.S.C. § 1326.

In fiscal year 2021, 11,565 people were convicted of illegal reentry pursuant to 8 U.S.C. § 1326 — a number that represented 73.4% of all immigration convictions nationwide.[15] 99% of the people convicted under § 1326 were Hispanic.[16] In other words, of the 11,565 people convicted of unlawful reentry, only 115 were non-Hispanic. These statistics are not the result of historical accident. As outlined *supra,* section 1326 was birthed, passed, and faithfully implemented to target and punish non-white immigration offenders.[17]

These laws continue to be enforced to the same effect today as they were when

Coming to the United States" (January 10, 2020), https://www.americanimmigrationcouncil.org/research/immigration-prosecutions (last accessed July 6, 2021).

[15] United States Sentencing Commission Quick Facts, "Illegal Reentry" (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY21.pdf (last accessed Oct. 20, 2022).

[16] *Id.*

[17] *See* Ian McDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, PROPUBLICA, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy (last accessed July 6, 2021); Kelly Lytle Hernandez, *How Crossing the US-Mexico Border Became a Crime, THE CONVERSATION*, April 30, 2017, https://theconversation.com/how-crossing-the-us-mexico-border-became-a-crime-74604 (last accessed July 6, 2021); Libby Watson, *How Crossing the Border Became a Crime, SPLINTER NEWS*, June 29, 2018, https://splinternews.com/how-crossing-the-border-became-a-crime-1827160001 (last accessed Sept. 20, 2021).

they were enacted nearly a century ago and have gone virtually unquestioned or challenged. Tellingly, no criminal law counterpart exists for people who overstay their visas, a group that is also "illegally" in this country, but whose top countries of origin are Canada (est. 93,035 Fiscal Year 2016) and countries in Europe (est. 123,729 Fiscal Year 2016).[18]

On the other hand, in fiscal year 2019, of the 22,077 illegal reentry cases reported, 99% of the defendants were Hispanic.[19] In fiscal year 2018, of the 18,241 illegal reentry cases reported, 98.8% of the defendants were Hispanic.[20] In fiscal year 2017, of the 15,767 illegal reentry cases reported, 98.9% of defendants were Hispanic.[21] In fiscal year 2016, of the 15,744 illegal reentry cases reported, 98.7% of the defendants were Hispanic.[22] In fiscal year 2015, of the 15,715 cases reported, 98.7% of defendants were

---

[18] Jeffrey S. Passel and D'Vera Cohn, *Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline To Leave*, PEW RESEARCH CENTER, February 3, 2016, http://www.pewresearch.org/fact-tank/2016/02/03/homeland-security-produces-first-estimate-of-foreign-visitors-to-u-s-who-overstay-deadline-to-leave/ (last accessed July 6, 2021).

[19] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY19.pdf (last accessed Oct. 20, 2022).

[20] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY18.pdf (last accessed Oct. 20, 2022).

[21] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY17.pdf (last accessed Oct. 20, 2022).

[22] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY16.pdf (last accessed Oct. 20, 2022).

Hispanic.[23] In fiscal year 2014, of the 16,556 cases reported, 98.3% of defendants were Hispanic.[24] In fiscal year 2013, out of 18,498 illegal reentry cases reported, 98.1% of defendants were Hispanic.[25] The numbers speak for themselves.

### C. The need to promote respect for the law and provide just punishment supports a sentence of 12 months.

Illegal re-entry is, at its core, a trespass offense – a trespass in the United States that has been criminalized as a result of racial animus. Section 3553(a) requires the Court to evaluate the need to promote respect for the law and provide just punishment for the instant offense. Should the Court impose a longer sentence in prison to promote respect for a law grounded in racist and eugenicist beliefs about the inferiority of Hispanics and enforced 99% of the time against a single racial group? Certainly not, even if illegal reentry has not yet been repealed or found unconstitutional.[26] Instead, the racist history and racially disparate enforcement of § 1326 support a downward variance.

---

[23] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2015), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Illegal_Reentry_FY15.pdf (last accessed Oct. 20, 2022).
[24] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2014), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick-Facts_Illegal-Reentry_FY14.pdf (last accessed Oct. 20, 2022).
[25] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2013), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Illegal_ReentryFY13.pdf (last accessed Oct. 20, 2022).
[26] The New Way Forward Act, which was introduced into Congress on December 10, 2019, would repeal both 8 U.S.C. § 1325 and § 1326. *See* New Way Forward Act, H.R. 5383, 116th Cong. § 601 (2019).

### IV. Mr. Kano-Castillo faces a harsher, longer prison sentence due to his immigration status.

Another factor Mr. Kano-Castillo asks this Court to consider is the severity and duration of the sentence Mr. Kano-Castillo will ultimately serve in the Bureau of Prisons (BOP). The BOP classifies non-U.S. citizenship as a "Public Safety Factor", which automatically elevates all undocumented immigrants to a higher security classification than their similarly situated peers.[27] Being placed in a prison with a higher security level means being surrounded by a more threatening peer group, enduring harsher living conditions, and less access to constructive programs.

What worsens prison conditions for undocumented immigrants even further is that they are also designated ineligible for most education, addiction, and vocational programs.[28] "The government defends its disparate treatment of undocumented inmates by claiming that it's not worth it to spend resources rehabilitating people who will just be deported at the end of their sentences."[29] The lack of access to self-improvement programs means that not only will he be removed from his community with only limited communication with the people he loves, he will also be denied any

---

[27] Federal Bureau of Prisons, Inmate Security Designation and Custody Classification (September 4, 2019), p. 10, https://www.bop.gov/policy/progstat/5100_008cn.pdf (last accessed Oct. 20, 2022).

[28] *See* Jacob Schuman, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented*, The Marshall Project (October 17, 2017), https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-the-undocumented (last accessed Oct. 20, 2022).

[29] *Id.* (linking to 28 CFR § 345).

opportunity to make positive use of his time in prison. In short, he will suffer more than others with similar criminal histories who have committed crimes of similar seriousness.

Mr. Kano-Castillo respectfully requests that the Court consider these factors in determining the appropriate term of imprisonment for his offense. Mr. Kano-Castillo's personal history and characteristics, the circumstances and relative non-seriousness of his crime, particularly when examined in historical context, as well as the harsh nature of the prison conditions he will inevitably be forced to endure, support a variant sentence.

Wherefore, Mr. Kano-Castillo respectfully requests that this Court impose a variant sentence of 12 months' imprisonment.

Respectfully submitted,


VIRGINIA L. GRADY
Federal Public Defender


s/Kilie Latendresse
KILIE LATENDRESSE
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO 80202

12

Telephone:  (303) 294-7002
FAX:  (303) 294-1192
kilie.latendresse@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Albert Buchman, Assistant United States Attorney
Al.Buchman@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Roberto Kano-Castillo (U.S. Mail)

s/Kilie Latendresse
KILIE LATENDRESSE
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
kilie.latendresse@fd.org
Attorney for Defendant